Opinion delivered March 1, 1884.

[No. 1634.]

JOHN DIXON *alias* ROBERT REED *v.* THE STATE.

1. THEFT—VENUE.—Where property is stolen in one county, and carried off by the offender to another, he may be prosecuted either in the county where he took the property, or in any other county through or into which he carried the same.

2. SAME.—Stated in another form, the rule is as follows: After one has done what amounts to a complete theft, if he continues carrying away the stolen things, each step he takes with them may be treated as a new trespass, and, the intent to steal not being abandoned, a fresh larceny; the consequence of which is that he may be indicted either in the county where he first took the goods, or in any other into which, the intent to steal continuing, he carries them.

3. SAME—PRACTICE—EVIDENCE.—The rule is general that circumstantial evidence is not admissible to establish a given fact, when direct and positive proof of such fact is attainable.

4. SAME—FACT CASE.—See evidence *held* insufficient to sustain a conviction for theft, inasmuch as the want of the owner's consent to the taking of the alleged stolen property is not established.

APPEAL from the District Court of Dallas. Tried below before the Hon. G. N. Aldredge.

This is an appeal from a conviction for the theft of two horses, the property of L. B. Miller, in Dallas county, Texas, on January 25, 1881. A term of eight years in the penitentiary was the penalty imposed by the verdict of guilty.

L. B. Miller was the first witness for the State. He testified that, at the time of this trial, and at the time of the theft, in January, 1881, he lived in Johnson county, Texas. On the night of the twenty-fifth day of that month, two horses were stolen from the witness's lot. The witness's first intimation of the loss of his horses was obtained on the following morning, when his boys, who went to the lot to feed the stock, returned to the house and reported that the two horses were gone. Taking up the search, the witness and his boys tracked the horses across his field to the bars in his field fence. They had evidently been led by two persons, as the tracks were too far apart for them to have been led by a single person. After the horses were taken from the field, their tracks showed that they were led in the direction of the town of Cleburne. A party of the witness's friends and neighbors took the trail forthwith, and followed it. The next time the witness heard of his horses, they were in a wagon yard in the city of Dallas. He went to Dallas immediately, made the necessary affidavits of ownership, and recovered them. One of these horses belonged to the witness, and the other was the property of his nineteen year old son, who lived with him.

Cross-examined, the witness said that he did not know the defendant, and had never seen him before this trial, that he knew of. The witness did not know who took the horses from the lot. The defendant, John Dixon, had a brother living near the witness's house, in Johnson county. The witness had seen John Dixon pass his place, going to his brother's house.

Morgan Miller was the next witness introduced by the State. He testified that he was a son of the first witness, L. B. Miller, and was living with him in Johnson county, Texas, on the twenty-fifth day of January, 1881, about the time the two horses described in the indictment were lost. They were first missed from the lot on the morning of the twenty-sixth, when witness went out to feed. Witness and others tracked the horses across the field and out at the bars. The tracks being rather distant apart indicated that the horses were led by two different men. A party was then made up and the trail was followed. It led first in the direction of the town of Cleburne. Two days later the horses

were found in a wagon yard in Dallas. They were proved and recovered by witness and his father.

Cross-examined, the witness testified that he did not know the defendant. He knew, however, that defendant had a brother living in that neighborhood, and it was quite possible that witness had seen the defendant a few times. Witness at no time saw the defendant in possession of the horses, and had no idea by whom the horses were stolen. The horses were taken without the knowledge and without the consent of the witness, and were recovered in the city of Dallas two days after the theft.

M. C. Simpson was the next witness introduced by the State. He testified that he was at present a resident of Johnson county, and resided there in January, 1881, near the residence of L. B. Miller. Some time during that month L. B. Miller came to the house of witness and told him that he had lost two horses from his horse lot. After following the trail for some distance and losing it, the party separated. The witness went to Waxahachie, in Ellis county, and there took the train for Dallas, which city he reached early next morning. Immediately upon his arrival in Dallas he sought out the chief of police, informed him of the loss of Miller's horses, and appealed to him for assistance in the search for them. Together, the chief of police and the witness searched throughout the city, and finally found the horses, which the witness readily recognized as belonging to Miller, in the Crutchfield wagon yard, near the square. He then ascertained that two men were confined in jail upon the charge of having stolen the horses. Witness went to the jail and saw the men, one of whom gave his name as Robert Reed. Witness could not say whether or not defendant was that man. Miller came to Dallas, proved the horses as his, and he and witness took them back to Johnson county.

Cross-examined, the witness testified that he did not know the defendant. He never saw him in possession of the stolen horses. He could not now say positively that he was or was not the man he saw in jail, who gave the name of Robert Reed. These horses were found in the Crutchfield wagon yard, two days after they were taken from Miller's lot.

Mr. Dean testified, for the State, that in January, 1881, he was a constable in Dallas county. During that month the witness arrested two men who came into the city of Dallas, each riding and leading a horse. Witness did not see these two men together, but learned that they came to town together. Witness ques-

tioned them, but neither of them could or would give a satisfactory account of himself. They claimed and pretended to be strangers to each other. Thereupon witness arrested them and put them in jail. One gave his name as Robert Reed, and the other as Floyd. Two of these horses were left in the Crutchfield wagon yard, and two in the O. K. wagon yard, in another part of town. Two of these horses were, a day or two afterwards, claimed by a Mr. Miller, of Johnson county, and on his making the necessary affidavits of ownership, they were turned over to him. The man who gave his name as Floyd subsequently died in jail. The man who gave his name as Reed gave bond and was released. The witness identified M. C. Simpson as the man who came from Waxahachie in search of the horses.

Cross-examined, the witness stated that in January, 1881, while he was constable, he learned that two suspicious looking characters, each riding and leading a horse, had crossed the river west of the city. Witness found them, and after discoursing with them a short while, arrested them on suspicion. He did not know positively that the defendant was one of those men.

Charley Myers testified, for the State, that he was a horse jockey, and resided in the city of Dallas. He lived in Dallas during the year 1881. Some time during the early part of that year, a man attempted to sell him two horses, at that time confined in the Crutchfield wagon yard. The man demanded a price so high the witness declined the purchase. They talked about the matter a long time. The defendant on trial was that identical individual. After discussing the proposed trade to no purpose for some time, the defendant went off, but quite soon returned with another man, who entered into a conversation with the witness, with the view of re-opening negotiations for a trade. Witness did not buy the horses, but questioned the two men closely about the horses. Finally, defendant said to his companion: "Come on; it is of no use to talk to him." One of the horses the witness looked at was proven away from defendant and his companion by another party.

Cross-examined, the witness stated that in 1881 he was trading in horses in the city of Dallas. It was in January of that year that the defendant offered to sell him the two horses in the Crutchfield wagon yard. The prices demanded were too high, and the witness did not purchase. Witness did not know what became of the defendant or the horses afterwards.

Henry Lewis testified, for the State, that he was a deputy sheriff of Dallas county, and held that position in January, 1881. During that month he assisted in the arrest of two men who came into the city, each riding and leading a horse. They were arrested on suspicion. The defendant was one of those men. He afterwards forfeited his bail bond and was re-arrested..

The State next introduced in evidence the bail bond of John Dixon, *alias* Robert Reed. The clerk of the District Court then testified that the defendant forfeited his bail, whereupon, in September or October, 1883, he issued an *alias capias*, upon which he was re-arrested. Defendant put in no appearance after indictment until re-arrested on the *alias capias*, in October, 1883.

W. H. W. Smith, sheriff of Dallas county, for the State, testified that he arrested the defendant in Parker county, Texas, in October, 1883, and brought him to Dallas county and placed him in jail. Witness knew nothing about the crime for which the defendant was on trial. The officers of Parker county telegraphed the witness in September or October, 1883, to know if a man named Dixon was wanted in Dallas. Witness investigated and found that there was a charge pending against a man of that name.

The motion for new trial assigned the first question passed upon in the opinion, and attacked, as error, the reception by the court of the evidence of Sheriff Lewis, the testimony of the district clerk as to the forfeiture of the bail bond, and the bail bond itself. It further alleged that the punishment assessed by the verdict was oppressive, and unwarranted by either the law of the case, or the evidence. The motion was overruled.

*Reeves & Spence*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. "Where property is stolen in one county and carried off by the offender to another, he may be prosecuted either in the county where he took the property, or in any other county through or into which he may have carried the same." (Code Crim. Proc., Art. 216.)

"After one has done what amounts to a complete theft, if he continues carrying away the stolen things, each step he takes with them may be treated as a new trespass, and, the intent to

steal not being abandoned, a fresh larceny; the consequence of which is that he may be indicted either in the county where he first took the goods, or in any other into which, the intent to steal continuing, he carries them." (1 Bish. Crim. Proc., 3 ed., sec. 59; *Cox* v. *The State*, 43 Texas, 101; *Connell* v. *The State*, 2 Texas Ct. App., 422; *Cameron* v. *The State*, 9 Texas Ct. App., 332; *Roth* v. *The State*, 10 Texas Ct. App., 28.)

In this case the ownership of the animals charged to have been stolen was alleged to be in L. B. Miller. As a witness, L. B. Miller testified in the case, and whilst his evidence shows many facts and circumstances going to establish non-consent on his part to the taking, yet it does not appear that he testified positively to the fact that such consent was not given by him. The rule is general that circumstantial evidence cannot be resorted to to establish a given fact, where direct and positive proof is attainable. (*Porter* v. *The State*, 1 Texas Ct. App., 394.)

The judgment is reversed and the cause remanded.

*Reversed and remanded.*